1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7  DON A. RENTERIA,                    )   1:07-CV-00161 AWI DLB HC
                                       )
8          Petitioner,                 )
                                       )   FINDING AND RECOMMENDATION
9      v.                              )   REGARDING PETITION FOR WRIT OF
                                       )   HABEAS CORPUS
10 B. CURRY,                           )
                                       )   OBJECTIONS DUE WITHIN THIRTY (30)
11         Respondent.                 )   DAYS
                                       )
12 _____ )

13         Petitioner Don A. Rentería, ("Petitioner") is a state prisoner proceeding pro se with a petition

14 for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

15                              **Procedural History**

16         On April 3, 2002, a jury convicted Petitioner of one count of second degree murder (Cal.

17 Pen. Code, § 187, subd. (a)[1]), and a second count of assault on a child under the age of eight by

18 means of force likely to produce great bodily injury resulting in death (§ 273ab).  The jury also

19 found true the allegations that Petitioner had suffered two prior prison terms within the meaning of

20 section 667.5, subd. (b).  See Respondent ("Resp't") Lodged E at 1.  The trial court sentenced

21 Petitioner to a total of 27 years to life, consisting of a term of 15 years to life for Count I, stayed

22 pursuant to section 654, 25 years to life for Count II plus a two-year enhancement consisting of a

23 one-year term for each of the two prison prior enhancements.  See Clerk's Transcript ("CT") at 710-

24 12, 714-15.

25         On May 10, 2002, Petitioner appealed the judgment to the California Court of Appeal.  See

26 Resp't Lodged Doc. A, Opening Brief (Case F0450534).  In his opening brief, Petitioner's claimed,

27

28         _____

           [1]Unless otherwise indicated, all statutory references are to the California Penal Code.

1   inter alia, that the trial court had improperly denied his motion to suppress evidence obtained from

2   the result of allegedly unlawful search.  Id. at 33-37. The trial court determined that as a parolee

3   subject to parole search, Petitioner had no reasonable expectation of privacy in his home.  See Resp't

4   Lodged Doc. G, Court of Appeal Unpublished Opinion of September 28, 2005.  While the state

5   appeal was pending, the California Supreme Court issued its opinion in People v. Sanders, 31

6   Cal.4th 318 (2003) which potentially impacted Petitioner's then-pending search and seizure claim.

7   In light of Sanders, the Court of Appeal reversed and ordered the matter remanded to the trial court

8   to allow the parties to relitigate the motion to suppress.  Id. at 2-3.   On May 12, 2004, the trial court

9   on remand, again denied Petitioner's motion to suppress and reentered judgment against Petitioner.

10  Id. at 3.  On September 28, 2005, the Court of Appeal affirmed the judgement.  Id.  Petitioner filed a

11  petition for review in the California Supreme Court on November 5, 2005.  See Resp't Lodged Doc.

12  E at 1.   The California Supreme Court denied the petition for review on January 4, 2006.  See

13  Resp't Doc. Lodged I.

14          Petitioner filed the instant petition for writ of habeas corpus in the United States

15  District Court, Northern District of California on January 9, 2007, but on January 22, 2007, the

16  matter was transferred to the Eastern District of California as the state court convicting Petitioner is

17  within the jurisdictional boundaries of the Eastern District.  Respondent filed an answer on

18  November 25, 2008.  See Doc. 21.

19                                      **Factual Background**

20          The Court adopts the California Court of Appeal's summation of the facts surrounding

21  Petitioner's crime and conviction:

22          A police officer responding to a child-in-distress call saw [Petitioner] Don Anthony
        Rentería's 2 1/2-year-old stepdaughter Samantha lying unconscious on the floor of his
23      home.  [Petitioner] told the officer that he had fallen on top of her, that she had hit her
        head on something, and that she had collapsed right after saying, "I'm okay, daddy,"
24      and taking a few steps.  Comatose on arrival at the hospital, Samantha died of
        devastating head trauma that the forensic pathologist and other medical experts
25      attributed to shaken baby syndrome.  [FN2]

26              FN2.  An expert witness testified that the term "shaken baby
                syndrome" and the term "shaken impact syndrome" both require
27              shaking but that only the latter requires impact.  The two terms reflect
                two schools of thought, one that shaking alone suffices to cause "the
28              severe damage we see in babies with evidence of shaking," the other

that both shaking and impact are necessary.  The record shows both syndromes were causes of death, so as a linguistic lowest common denominator our opinion will use only the former term to refer to both syndromes.

On the rationale that as a parolee subject to parole search conditions, [Petitioner] had no reasonable expectation of privacy in his home-whether or not the police were aware of his status at the time of the search-the court denied his motion to suppress. At trial, a jury found [Petitioner] guilty of second degree murder and assault resulting in the death of a child under eight years of age.  (§§ 187, subd. (a), 273ab.  [FN3])  After briefing was complete in his original appeal, the Supreme Court held that "an otherwise unlawful search of the residence of an adult parolee may not be justified by the circumstance that the suspect was subject to a search condition of which the law enforcement officers were unaware when the search was conducted."  (*People v. Sanders* (2003) 31 Cal.4th 318, 335, 2 Cal.Rptr.3d 630, 73 P.3d 496 (*Sanders*).)  On the state of the law before *Sanders*, the failure of the parties to litigate that issue is understandable . . . [given] the court's finding that the evidence was irrelevant.  (See, e.g., *In re Tyrell J.* (1994) 8 Cal.4th 68, 85-86, 32 Cal.Rptr.2d 33, 876 P.2d 519.)

> FN3.  All statutory references not otherwise noted are to the Penal Code.  Section 273ab provides:  "Any person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life. Nothing in this section shall be construed as affecting the applicability of subdivision (a) of Section 187 or Section 189."

With no evidence of whether the police were aware at the time of the search that [Petitioner] was on parole, the record of the hearing on his motion was inadequate to enable us to determine, on the state of the law after *Sanders*, whether the court's ruling was sustainable on the Fourth Amendment rationale that the parties litigated. Likewise, the record was inadequate to enable us to determine whether, had the court and counsel not justifiably relied on the state of the law before *Sanders*, the parties might have litigated, and the court might have adjudicated, other Fourth Amendment rationales that might have affected the admissibility of some or all of the evidence subject to the court's ruling.

Consequently, we reversed the judgment solely for the parties to litigate anew the motion to suppress and for the court to make findings, issue rulings, and proceed as just under the circumstances.  (See *People v. Dachino* (2003) 111 Cal.App.4th 1429, 1434, 4 Cal.Rptr.3d 691; *People v. LeBlanc* (1997) 60 Cal.App.4th 157, 167-168, 70 Cal.Rptr.2d 195.)  Pursuant to the doctrine of ripeness, we deferred adjudication of all of [Petitioner's] other issues. (*Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, 1722, 45 Cal.Rptr.2d 752, citing *California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 22, 61 Cal.Rptr. 618; cf. *People v. Superior Court ( Marks )* (1991) 1 Cal.4th 56, 65, fn. 6, 2 Cal.Rptr.2d 389, 820 P.2d 613.)  On remand, the court heard and denied his motion to suppress and again entered judgment against him.  In his pending appeal, he argues not only his Fourth Amendment issue on the basis of the record of the hearing after remand but also his original issues on the basis of the record of trial and the briefing in his original appeal.  We will affirm the judgment.

See Resp't Lodged Doc. G, Court of Appeal Unpublished Opinion of September 28, 2005.

**DISCUSSION**

**I.     Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, n. 7, (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

**II.     Standard of Review**

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment.  Lindh v. Murphy, 521 U.S. 320, 326-27 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA and is consequently governed by its provisions.  See Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Thus, the petition "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"  Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)), overruled in part on other grounds, Hayward v. Marshall, 603 F.3d 546, 555 (9th Cir. 2010) (en banc); see Lockyer, 538 U.S. at 70-71.

Title 28 of the United States Code, section 2254 remains the exclusive vehicle for Petitioner's habeas petition as Petitioner is in the custody of the California Department of

1  Corrections and Rehabilitation pursuant to a state court judgment.  See Sass v. California Board of

2  Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006) overruled in part on other grounds, Hayward,

3  603 F.3d at 555.  As a threshold matter, this Court must "first decide what constitutes 'clearly

4  established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538

5  U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal

6  law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's]

7  decisions as of the time of the relevant state-court decision."  Id. (quoting Williams, 529 U.S. at

8  412).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal

9  principle or principles set forth by the Supreme Court at the time the state court renders its

10  decision."  Id.  Finally, this Court must consider whether the state court's decision was "contrary to,

11  or involved an unreasonable application of, clearly established Federal law."  Id. at 72 (quoting 28

12  U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if

13  the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

14  of law or if the state court decides a case differently than [the] Court has on a set of materially

15  indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.  "Under the

16  'unreasonable application clause,' a federal habeas court may grant the writ if the state court

17  identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

18  that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "[A] federal court may

19  not issue the writ simply because the court concludes in its independent judgment that the relevant

20  state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that

21  application must also be unreasonable."  Id. at 411.  A federal habeas court making the

22  "unreasonable application" inquiry should ask whether the State court's application of clearly

23  established federal law was "objectively unreasonable."  Id. at 409.

24         Petitioner bears the burden of establishing that the state court's decision is contrary to or

25  involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle,

26  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

27  Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

28  decision is objectively unreasonable.  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While

1   *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents

2   need be reasonably applied, we may look for guidance to circuit precedents"); Duhaime v.

3   Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999) ("[B]ecause of the 1996 AEDPA amendments, it

4   can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit

5   precedent on a federal Constitutional issue. . . .  This does not mean that Ninth Circuit case law is

6   never relevant to a habeas case after AEDPA.  Our cases may be persuasive authority for purposes

7   of determining whether a particular state court decision is an 'unreasonable application' of Supreme

8   Court law, and also may help us determine what law is 'clearly established'").  Furthermore,

9   AEDPA requires that the Court give considerable deference to state court decisions.  The state

10  court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  A federal habeas court is

11  bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.

12  2002).

13        The initial step in applying AEDPA's standards is to "identify the state court decision that is

14  appropriate for our review."  Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more

15  than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last

16  reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) for the presumption

17  that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same

18  ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained

19  state court decisions to the last reasoned decision to determine whether that decision was contrary to

20  or an unreasonable application of clearly established federal law.  Bailey v. Rae, 339 F.3d 1107,

21  1112-13 (9th Cir. 2003).

22        In the instant petition, Petitioner raises eight grounds for relief.  Petitioner raised all eight

23  grounds through direct appeal to the California Court of Appeal, which following an initial remand,

24  affirmed the judgment in a reasoned opinion.  See Resp't Lodged Doc. G.  Petitioner's claims were

25  then raised in a petition for review to the California Supreme Court, which summarily denied

26  review.  See Resp't Doc. Lodged I.  The California Supreme Court, by its "silent order" denying

27  review is presumed to have denied the claim for the same reasons stated in the opinion of the lower

28  court.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  Therefore, the Court "look[s] through" this

1   decision to the last reasoned decision, in this case, that of the California Court of Appeal, and

2   analyzes whether the state court's decision was an objectively unreasonable application of federal

3   law.  See Nunnemaker, 501 U.S. at 803-804.

4          Additionally, the state courts need not have cited to federal authority, or even have indicated

5   awareness of federal authority in arriving at their decision.  Early v. Packer,  537 U.S. 3, 8 (2002).

6   Where the state courts have not addressed the constitutional issue in dispute in any reasoned

7   opinion, the federal court will independently review the record in adjudication of that issue.

8   "Independent review of the record is not de novo review of the constitutional issue, but rather, the

9   only method by which we can determine whether a silent state court decision is objectively

10  unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).   Here because the Court of

11  Appeal's reasoned opinion did not address Petitioner's federal constitutional issue raised in Grounds

12  Six, Seven, and Eight, this Court independently reviews the record for those claims.

13  **III.     Review of Petitioner's Claims**

14         Petitioner raises eight grounds for relief.  Petitioner's Ground One asserts the trial court erred

15  in denying his motion to suppress evidence obtained from a warrantless search in violation of his

16  rights under the Fourth Amendment to the United States Constitution.  See Petition at 6.  Petitioner's

17  Ground Two claims the trial court violated his constitutional rights in admitting his allegedly

18  involuntary statements made to law enforcement at the close of custodial interrogation.  See Petition

19  at 6.  In Ground Three, Petitioner contends the trial court improperly admitted "scientific evidence"

20  resulting in prejudice which violated his right to due process.  See Petition at 6.  In Ground Four,

21  Petitioner argues that the trial court improperly limited his counsel's cross-examination of key

22  witnesses which violated his Sixth Amendment right to confrontation.  See Petition at 7.  Petitioner's

23  Ground Five claims that Count Two's statute, § 273ab, is itself unconstitutional and violates due

24  process.  See Petition at 7.  Petitioner's Ground Six contends that he was improperly convicted of

25  two separate homicide charges for the same conduct in violation of his constitutional rights.  See

26  Petition at 7.  In Ground Seven, Petitioner asserts the trial court judge's unfavorable rulings and

27  comments made over the course of the trial demonstrate judicial bias.  See Petition at 7.  Petitioner's

28  Ground Eight asserts that the trial court erred in admitting his previous conviction for child abuse

1   which improperly influenced the jury regarding his propensity to commit the charged offense.  See

2   Petition at 8.

3          **A.      Petitioner's Ground One:  Denial of Motion to Suppress Evidence**

4          Petitioner asserts his Fourth Amendment rights were violated when the state court

5   improperly denied his motion to suppress evidence gained from an unreasonable search.  See

6   Petition at 6.  According to Petitioner, law enforcement's search of his residence was unreasonable

7   as exigent circumstances were not present to warrant the law enforcement officer's continued "room

8   to room" search "without obtaining actual consent and without a warrant."  See Petition at 6.

9          On direct appeal, the Court of Appeals upheld the trial court's ruling.  See People v.

10  Renteria, No. F045737 2005 WL 2374279 at 3 (Cal. Ct. App. September 28, 2005) ("Renteria").

11  Recounting the factual background of law enforcement's search of the residence and the trial court's

12  analysis, the Court of Appeals stated:

13          Shortly after 9:00 a.m., as the evidence at the hearing on the motion showed, Officer
            Brent Bischel arrived at [Petitioner's] home in response to "an unconscious child"
14          call.  He knocked on the door, which someone opened, and went directly to
            Samantha, whom he saw lying on the living room floor, unconscious but breathing.
15          Within minutes, after ambulance personnel arrived, he began interviewing people in
            the house.  He asked [Petitioner] to show him where the accident took place.
16          [Petitioner] took him into his bedroom, where he told him he went to his closet to get
            his shoes, stepped backwards, and fell onto Samantha with his entire weight.
17
            Bischel went into the closet and asked him what could have caused Samantha's
18          injuries.  Saying she might have hit her head on something in the closet, [Petitioner]
            moved aside a diaper bag to reveal a piggy bank about three-quarters full of coins.
19          Either he picked up and handed to Bischel, or Bischel himself picked up, the piggy
            bank, which one of them put on the bed.  Bischel did not force [Petitioner] to talk, to
20          take him to his bedroom, or to show him where the accident took place.  [Petitioner]
            never said he did not want to talk or did not want Bischel to be in the bedroom with
21          him.  Bischel did not know that [Petitioner] was on parole.  He understood the
            importance of including [Petitioner's] consent in his police report but put nothing like
22          that in his police report.  Instead, he wrote, "I had [Petitioner] take me into the
            bedroom."  By that he meant not that he forced him but just that he asked him to
23          show him the bedroom and the closet.

24          After [Petitioner] said he wanted to go the hospital, Bischel left and met him later at
            the hospital.  He neither arrested him nor accompanied him there.  At around 10:45
25          a.m. at the hospital, Detective Samuel Castañeda talked with doctors and again with
            [Petitioner], ran a rap sheet on [Petitioner], and, after learning of his parole status,
26          secured verbal consent from both him and the child's mother to search the bedroom
            again.  He asked for the mother's consent to "bolster the search."  His police report
27          says nothing about asking [Petitioner] for, and nothing about [Petitioner] giving,
            verbal consent to search.

28

1

2   At about 11:30 a.m., Officer José Guzman arrived at the home to preserve the potential crime scene until a detective arrived. He asked a female adult whose name he did not know for permission to enter the home. She let him in. He went straight to the bedroom and stood by until Detective Gary Johnson arrived at about 11:50 a.m. Johnson searched the bedroom, took photographs, and seized the piggy bank. Afterward, shortly after noon, [Petitioner] signed a consent-to-search form. Even though Castañeda had [Petitioner's] verbal consent to search, he had him sign the form "to bolster the search." He never sought or secured a search warrant.

5

6   The court found [Officer] Bischel's entry into the home a lawful response to an emergency call (on which point, the court noted, there was no dispute between the parties) and found credible his testimony that he asked, not ordered, [Petitioner] to take him to the bedroom. Noting the consistency with [Petitioner's] later signing of the consent-to-search form, the court found Castañeda's testimony credible that [Petitioner] gave verbal consent to search. The court ruled that Bischel's conduct in the bedroom and the closet either was not a search or was a consensual search and that Johnson's ensuing search on the authority of [Petitioner's] verbal consent and parole status was lawful. On those grounds, the court denied the motion to suppress.

10  See Renteria at 2-3.

11

12      The Court of Appeals found substantial evidence supported the trial court's determination

13  that the search was lawful in that: (1) sufficient exigent circumstances warranted the initial entry in

14  the home without a search warrant; (2) "Bischel asked, not ordered Petitioner to take him to the

15  bedroom"; (3) Petitioner "voluntarily gave his verbal consent to search to Castañeda"; (4) prior

16  police knowledge of [Petitioner's] parole status with parole search conditions authorized Johnson's

17  search; and (5) "an adult female voluntarily consented to Guzman's entry into the home to secure

    the crime scene until Johnson arrived." See Renteria at 3.

18

19      A federal district court cannot grant habeas corpus relief on the ground that evidence was

20  obtained by an unconstitutional search and seizure if the state court has provided the petitioner with

21  a "full and fair opportunity to litigate" the Fourth Amendment issue. Stone v. Powell, 428 U.S. 465,

22  494 (1976); Woolery v. Arvan, 8 F.3d 1325, 1326 (9th Cir.1993), cert denied, 511 U.S. 1057 (1994).

23  The only inquiry this Court can make is whether petitioner had a fair opportunity to litigate his

24  claim, not whether petitioner did litigate nor even whether the court correctly decided the claim.

25  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996); see also Gordon v. Duran, 895 F.2d

26  610, 613 (9th Cir. 1990) (holding that because Cal.Penal Code § 1538.5 provides opportunity to

27  challenge evidence, dismissal under Stone was necessary).

28

The policy behind the <u>Stone</u> Court's analysis is that the exclusionary rule is applied to stop future unconstitutional conduct of law enforcement.  <u>Stone</u>, 428 U.S. at 492.  However, excluding evidence that is not untrustworthy creates a windfall to the defendant at a substantial societal cost.  <u>See</u> <u>Stone</u>, 428 U.S. at 489-90; <u>Woolery</u>, 8 F.3d at 1327-28.  Thus, the Ninth Circuit has described the rationale for this rule by saying:

> The holding is grounded in the Court's conclusion that in cases where a petitioner's Fourth Amendment claim has been adequately litigated in state court, enforcing the exclusionary rule through writs of habeas corpus would not further the deterrent and educative purposes of the rule to an extent sufficient to counter the negative effect such a policy would have on the interests of judicial efficiency, comity and federalism.

<u>Woolery</u>, 8 F.3d at 1326; <u>see also</u> <u>Stone</u>, 428 U.S. at 493-494.

In this case, Petitioner's Fourth Amendment claim was litigated through a suppression hearing in the Kern County Superior Court.  <u>See</u> CT at 46-62.  The trial court denied the motion.  <u>See</u> CT at 62.  Therefore, the state court provided Petitioner a "full and fair opportunity to litigate" his Fourth Amendment claim.  <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976).  Pursuant to <u>Stone v. Powell</u>, habeas relief on this ground should be denied.

**B.      Petitioner's Ground Two:  Petitioner's alleged involuntary inculpatory statements**

Petitioner contends that his constitutional rights were violated during a lengthy post-arrest interrogation where he was "repeatedly threatened with the death penalty and promised leniency." <u>See</u> Petition at 6.  Raising this claim on direct appeal, Petitioner argued that the trial court erred in admitting Petitioner's in-custody inculpatory statements which were made following law enforcement's allegedly improper statements, and shortly after Petitioner had stated that he desired representation.  <u>See</u> Resp't Doc. Lodged A at 37-39.

The Court of Appeal denied Petitioner's claim as follows:

> [Petitioner] argues that police promises of leniency and threats of the death penalty rendered his inculpatory in-custody statements involuntary and the admission of those statements in evidence violative of due process.  The Attorney General argues that the court properly ruled those statements voluntary and admissible.
>
> Two days after the child-in-distress call, detectives interviewed [Petitioner] and took statements from him.  He and the prosecutor filed motions in limine asking the court to exclude and admit, respectively, those statements.  At the hearing on the motions, the prosecutor played, and the court reporter transcribed, a tape recording of that

interview.  (Evid.Code, § 402.)  Representative of the statements he characterizes as improper promises of leniency are a detective's comments that he could help himself by telling the truth and being "totally forthright" because it would "really look bad to the jury if the evidence doesn't match what you're telling us," that "it's going to go a lot better for you" if he were to cooperate, and that "[w]e can't help you unless you're honest."  Representative of the statements he characterizes as improper threats of the death penalty are a detective's comments that "you need to help yourself right now because if you don't you're probably going down forever and you'll probably never see daylight again," that "the death penalty's not totally out of the question," and that "you're looking at a possible death sentence here."  The record of the end of the interview shows that as a detective asked him to be "honest with us and tell us the truth" [Petitioner] interrupted him and said, "I want to talk to a lawyer."  The detective replied, "I can't help you," and asked no other questions.  Another detective turned off the tape recorder.  Both detectives stood up to walk him back to his cell.  Afterward, with no question pending, [Petitioner] volunteered that "she doesn't deserve a lie" and that "when we were in the closet I think I must have pushed her or something."  The court found a break in time between the end of his interview and those statements, a break in activity between the end of his interview and the return to his cell, and a lack of any threatening activity at the time of those statements.  On the basis of those findings, the court admitted those statements as a "classic spontaneous kind of an utterance."

The due process clause prohibits the admission of an involuntary statement.  (*Mincey v. Arizona* (1978) 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290; *People v. Weaver* (2001) 26 Cal.4th 876, 920, 111 Cal.Rptr.2d 2, 29 P.3d 103.)  A reviewing court will determine a statement is involuntary if and only if "all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation"-show the accused's "will was overborne" and the statement was not "the product of a rational intellect and a free will."  (*Schneckloth v. Bustamonte*, supra, 412 U.S. at p. 226; *Blackburn v. Alabama* (1960) 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242.) [Petitioner] argues that *People v. Denney* (1984) 152 Cal.App.3d 530, 199 Cal.Rptr. 623 and *People v. Flores* (1983) 144 Cal.App.3d 459, 192 Cal.Rptr. 772 show his statements were involuntary.  In neither of those cases did the accused spontaneously volunteer statements after the interrogation had come to an end.  (*People v. Denney*, supra, at pp. 540-546, 199 Cal.Rptr. 623; *People v. Flores*, supra, 144 Cal.App.3d at pp. 464-472, 192 Cal.Rptr. 772.)  Here, the requisite nexus between the detective's comments and [Petitioner's] statements is missing.  Statements the accused volunteers not in response to interrogation are admissible.  (*People v. McDaniel* (1976) 16 Cal.3d 156, 172, 127 Cal.Rptr. 467, 545 P.2d 843; *People v. Stephens* (1990) 218 Cal.App.3d 575, 582, 267 Cal.Rptr. 66.) That is so here.

See Renteria at 6-7.

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment.  Blackburn v. Alabama, 361 U.S. 199, 207 (1960).  "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing Haynes v. Washington, 373

1  U.S. 503, 513–14, (1963)).[4]

2      A suspect who has expressed a desire to have counsel present during custodial interrogation

3  is not subject to further interrogation by the authorities until counsel is made available to him.

4  Edwards v. Arizona, 451 U.S. 477, 484–85 (1981); Alvarez v. Gomez, 185 F.3d 995, 998 (9th Cir.

5  1999).  However, police may continue the interrogation if the accused himself voluntarily initiates

6  further communication.  Oregon v. Bradshaw, 462 U.S. 1039, 1045–46 (1983); United States v.

7  Rodriguez–Lopez, 63 F.3d 892, 893 (9th Cir. 1995)

8      The decision of the California Court of Appeal that Petitioner's statements to law

9  enforcement was neither coerced nor involuntary is not contrary to or an unreasonable application of

10  federal law and should not be set aside.  The facts cited by the Court of Appeal are consistent with

11  this Court's review of the available portion of the transcribed interview and law enforcement

12  testimony.  See Reporter's Transcript ("RT") at 351-356; see also CT at 475-493.  "Volunteered"

13  statements of any kind are not barred by the Fifth Amendment.  Rhode Island v. Innis, 446 U.S. 291,

14  300-01 (1980) ("Innis").  Interrogation occurs "whenever a person in custody is subjected to either

15  express questioning or its functional equivalent."  Id.  With regard to Petitioner's inculpatory

16  statements, the record reflects that at the time Petitioner made these statements, he was not subjected

17  to any express questioning.  See RT at 351-356.  This test is based on whether the police used words

18  or actions that they should have known were reasonably likely to elicit an incriminating response.

19  Innis, 446 U.S. at 302.  The record reflects that Petitioner's statement, "she doesn't deserve a lie"

20  was made spontaneously and that Petitioner was under no compulsion to make this statement.  Innis,

21  446 U.S. at 300 ("interrogation, as conceptualized in the Miranda opinion, must reflect a measure of

22  compulsion above and beyond that inherent in custody itself").

23      Additionally, although Petitioner argues that the questioning was coercive, Petitioner

24  presents no evidence that coercion led to Petitioner's statements or that Petitioner's will was

25  overborne.  United States v. Guerrero, 847 F.2d 1363, 1366 (9th Cir.1988) (promise to recommend

26

27      [4]The Ninth Circuit recently stated that these factors include "the degree of police coercion; the length, location and
continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age."  Brown
28  v. Horell, 644 F.3d 969 (9th Cir. 2011) (citation omitted).

1  leniency not enough); <u>Anderson v. Terhune</u>, 467 F.3d 1208, 1213 (9th Cir. 2006) (withholding of

2  cigarettes and warm clothing, exploitation of defendant's mental condition brought on by chronic

3  drug use, threats of seeking death penalty, ignoring defendant's requests to remain silent held not

4  sufficient to show confession was coerced); <u>see also</u> <u>Clark v. Murphy</u>, 331 F.3d 1062, 1073 (9th Cir.

5  2003) (eight hour interrogation in a small, windowless interrogation room did not render confession

6  involuntary), cert. denied, 540 U.S. 968 (2003), overruled in part on other grounds by <u>Lockyer v.</u>

7  <u>Andrade</u>, 538 U.S. 63 (2003).  Accordingly, the state court's rejection of Petitioner's second claim

8  for relief was neither contrary to, nor an unreasonable application of, controlling principles of United

9  States Supreme Court precedent.  Petitioner's second claim for relief should be denied.

10      **C.      Petitioner's Ground Three:  Petitioner's objections to the admission of scientific evidence**

11

12      At trial, the prosecution offered expert medical evidence regarding the victim's injuries

13  including testimony interpreting a computer graphics simulation which described the diagnosis and

14  physiological effects of "Shaken Baby Syndrome."  <u>See</u> RT at 616-633, 756-770, and 826-857.  The

15  expert's testimony compared the severity of the victim's injuries to an automobile accident, or a fall

16  from a multi-story building or someone jumping off a one story balcony and slamming into a child

17  with an elbow.  <u>See</u> RT at 630, 774-775, 842.  Petitioner's Ground Three claims that the trial court

18  erred in allowing this expert testimony based on speculative scientific evidence resulting in

19  prejudice leading to his conviction.  <u>See</u> Petition at 6.  On direct appeal, Petitioner argued the

20  graphics simulation itself was inadmissible because the facts as described by the video and the facts

21  of the instant case were distinguishable.  <u>See</u> Resp't Lodged Doc. A at 59.  More specifically,

22  Petitioner previously asserted:

23          A jury viewing a video of a baby being shaken back and forth would clearly come to
        a conclusion that this was an aggravated reckless or flagrant act which any person
        would recognize as departing from non-criminal behavior.  In contrast, the falling of a
24      child who is underfoot with another person falling on top of them, which may also
        shake the head as it bounces, is significantly different and much more likely for the
25      jury to view this as the result of inattention or misadventure.  Thus, the
        demonstration, which was not based on any reliable factual foundation, prejudiced
26      [Petitioner].

27  <u>See</u> Resp't Lodged Doc. A at 59.

28      The Court of Appeal denied Petitioner's claim stating:

[Petitioner] argues that the court erred by admitting expert medical evidence about Samantha's injuries.  The Attorney General argues that the court committed no error.

[Petitioner] focuses primarily on a computer graphics simulation about shaken baby syndrome and on expert medical testimony interpreting that simulation and characterizing Samantha's brain injuries as worse than those from suffering a car crash or a one-story or two-story fall and as equivalent to those from slamming an elbow into a child after a one-story jump or hitting the ground with one's head after a two- or three-story fall.  He argues that since expert medical witnesses acknowledged the absence of "any data, any experiment, any test" to support evidence he characterizes as conjectural, speculative, and devoid of adequate foundation, the "'aura of special reliability and trustworthiness'" intrinsic to expert medical evidence made the evidence prejudicial.

Even though achieving "absolute accuracy" is "impossible," the law nonetheless allows expert medical witnesses "to reach satisfactory-not infallible-conclusions" on matters "'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'" (*Box v. California Date Growers Assn.* (1976) 57 Cal.App.3d 266, 274, 129 Cal.Rptr. 146, quoting *People v. Cole* (1956) 47 Cal.2d 99, 103, 301 P.2d 854; see Evid.Code, § 801, subd. (a).)  Since brain injuries from shaken baby syndrome are hardly common knowledge, the court here admitted expert medical evidence to assist the jury in evaluating the injuries Samantha suffered.

The record shows extensive defense cross-examination of the prosecution's medical experts on precisely the issues of conjecture, speculation, and lack of foundation [Petitioner] now argues on appeal.  One of those experts conceded that tests on monkeys have "some value" but that "not using the real thing" requires making "certain allowances" due to the absence of any experiment that subjects children to impacts like those.  Another admitted that shaken baby syndrome experts "do not consider anecdotal data to be good scientific research" and acknowledged that "speculative extrapolations" from "reported injuries, animal experiments, and theoretical models" indeed "may lead to difficulty."

In argument to the jury, [Petitioner's] counsel slammed the prosecution's "so-called experts" for basing the "shifting theories of shaken baby syndrome" on "inexact science."  He highlighted the lack of agreement among shaken baby syndrome experts over whether the injuries require an impact or just shaking.  Not only do the experts fail to "agree as to the basics," he argued, but there is also "a lack of empirical evidence" due to a "simple inability to conduct experimental tests."

In the charge to the jury, the court cautioned the jury about the limitations of expert testimony:

"Witnesses who have special knowledge, skill, experience, training or education in a particular subject have testified to certain opinions.  Any such witness is referred to as an expert witness.  In determining what weight to give to any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion."

"An opinion is only as good as the facts and reasons on which it is based.  If you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion.  Likewise, you must consider the strengths and weaknesses of the reasons on which it is based."

1    "You are not bound by an opinion.  Give each opinion the weight you find it
     deserves. You may disregard any opinion if you find it to be unreasonable."
2    (CALJIC No. 2.80.)

3    [Petitioner] neither argues that the court erred by so instructing nor cites to anything
     in the record that might rebut the general presumption that jurors understand and
4    follow the court's instructions.  (*People v. Welch* (1999) 20 Cal.4th 701, 773, 85
     Cal.Rptr.2d 203, 976 P.2d 754.)

5
     "One asserting prejudice has the burden of proving it; a bald assertion of prejudice is
6    not sufficient." (*People v. Johnson* (1988) 47 Cal.3d 576, 591, 253 Cal.Rptr. 710, 764
     P.2d 1087.)  By the deferential abuse of discretion standard of review, [Petitioner]
7    fails to discharge his burden. (*People v. Mayfield* (1997) 14 Cal.4th 668, 766, 60
     Cal.Rptr.2d 1, 928 P.2d 485.).  [^FN5]

8
                  FN5.  Not until the last paragraph of a 16-page argument does
9                 [Petitioner] argue in passing that the court's rulings fail to meet the
                  standards that the United States Supreme Court and the California
10                Supreme Court articulated, respectively, in *Daubert v. Merrell Dow
                  Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 113 S.Ct. 2786, 125
11                L.Ed.2d 469 (*Daubert*) and *People v. Kelly* (1976) 17 Cal.3d 24, 130
                  Cal.Rptr. 144, 549 P.2d 1240 (*Kelly*).  He cites to nothing in the record
12                to show he raised either a *Daubert* objection or a *Kelly* objection
                  below.  (See *People v. Diaz* (1992) 3 Cal.4th 495, 527-528, 11
13                Cal.Rptr.2d 353, 834 P.2d 1171.)  Even had he properly raised his
                  argument here (*see In re David L.* (1991) 234 Cal.App.3d 1655, 1661,
14                286 Cal.Rptr. 398), in any event he could not have stated a meritorious
                  claim for relief.  First, the California Supreme Court has expressly
15                declined to adopt *Daubert* as the applicable standard in California.
                  (*People v. Wilkinson* (2004) 33 Cal.4th 821, 843, 16 Cal.Rptr.3d 420,
16                94 P.3d 551; *People v. Leahy* (1994) 8 Cal.4th 587, 593-604, 34
                  Cal.Rptr.2d 663, 882 P.2d 321.)  Second, the California Supreme
17                Court has expressly disavowed applying the *Kelly* standard to expert
                  medical evidence. (*People v. Rowland* (1992) 4 Cal.4th 238, 266, 14
18                Cal.Rptr.2d 377, 841 P.2d 897; *People v. McDonald* (1984) 37 Cal.3d
                  351, 373, 208 Cal.Rptr. 236, 690 P.2d 709, overruled on another
19                ground by *People v. Mendoza* (2000) 23 Cal.4th 896, 914, 98
                  Cal.Rptr.2d 431, 4 P.3d 265.)

20
     See Renteria at 6-7.
21
          Unless a state court evidentiary ruling violates due process or other constitutional guarantees,
22
     questions related to the admissibility of evidence remain matters of state law for which federal
23
     habeas corpus relief is unavailable.  See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991).
24
          In Daubert v. Merrell Dow Pharmaceuticals, Inc., the United States Supreme Court held that
25
     scientific evidence need not have gained general acceptance in the relevant scientific community in
26
     order to be admissible under the Federal Rules of Evidence.  Daubert, 509 U.S. at 597.  Because it
27
     involved an interpretation of the Federal Rules of Evidence, "Daubert does not set any specific
28

1  constitutional floor on the admissibility of scientific evidence." Wilson v. Sirmons, 536 F.3d 1064,

2  1101–02 (10th Cir.2008); see also Kinder v. Bowersox, 272 F.3d 532, 545 n. 9 (8th Cir.2001)

3  ("Daubert does not bind the states, which are free to formulate their own rules of evidence subject

4  only to the limits imposed by the Constitution").[6]

5         In Holley v. Yarborough, the Ninth Circuit explained:

6         Under AEDPA, even clearly erroneous admissions of evidence that render a trial
           fundamentally unfair may not permit the grant of federal habeas corpus relief if not
7         forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28
           U.S .C. § 2254(d).  In cases where the Supreme Court has not adequately addressed a
8         claim, this court cannot use its own precedent to find a state court ruling
           unreasonable.

9
   Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("Holley") [citation omitted].
10
11       "Although the Court has been clear that a writ should be issued when constitutional errors

12  have rendered the trial fundamentally unfair," the Supreme Court "has made very few rulings

13  regarding the admission of evidence as a violation of due process." Holley, supra, 568 F.3d at 1101.

14  If there is no applicable "clearly established Federal law," it cannot be concluded that a state court's

15  ruling was an "unreasonable application." Id.  In this case, it appears that Petitioner's claim fails for

16  lack of clearly established precedent, as the Supreme Court has not established specific

17  constitutional requirements for the admissibility of medical evidence or scientific evidence in

18  general.

19       Nevertheless, Petitioner's claims would fail under even Ninth Circuit precedent.  The Ninth

20  Circuit has held that the improper admission of evidence violates a defendant's due process rights

21  only when it renders the trial fundamentally unfair.  Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir.

22  1995) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the

23  trial fundamentally unfair in violation of due process.") (citing Estelle, 502 U.S. at 67–68).  An

24  evidentiary ruling renders a trial so "fundamentally unfair" as to violate due process only if "there

25  _____

26       [6]State courts and legislatures remain free to adopt more rigorous safeguards regarding the admissibility of scientific
   evidence than those imposed by the Federal Constitution. California v. Trombetta, 467 U.S. 479, 491 n. 12, (1984).  The
27  California Supreme Court has held that California courts are not bound by Daubert and thus continue to require general
   acceptance in the scientific community as a condition of admissibility of scientific evidence. See People v. Leahy, 8 Cal.4th
28  587, 594–603 (1994).  Of course, no relief is available for an alleged failure by the state court to comply with state law. See
   Estelle, 502 U.S. at 67–68.

are no permissible inferences the jury may draw from the evidence." Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998) (emphasis in original) (quoting Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991)); see also Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005) ("A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision").

Petitioner fails to show there were no permissible inferences to be drawn from either the video or the expert testimony. As noted by the Court of Appeal, because "Shaken Baby Syndrome" is well beyond common experience, both the video and accompanying expert opinion were offered to assist the jury in evaluating the victim's injuries and were probative to refute Petitioner's defense that the victim's injuries resulted from the force of Petitioner falling on top of the victim. See Renteria at 7; See RT at 647. According to trial testimony, the simulation video was offered to explain, in simplified terms, the medical diagnosis of "Shaken Baby Syndrome." See RT at 647. Minimizing the possible prejudice of the video to Petitioner, expert testimony made it clear that the video did not portray an actual child being shaken. See RT at 860-861. Outside the presence of the jury, the trial court viewed the video and properly allowed Petitioner's counsel to argue its exclusion. See RT at 646-53. To that end, Petitioner's counsel conducted voir dire of the state's expert regarding the video's accuracy and the expert confirmed the video's accuracy and stated the video was useful to "help explain what is not visible to the human eye." See RT at 648-653, 655.

Nothing prevented Petitioner from introducing his own experts to bolster his defense or to refute the state's evidence. See generally Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). In sum, the admission of video and expert testimony did not render Petitioner's trial fundamentally unfair. See Estelle, 502 U.S. at 70 (holding that admission of evidence which is "relevant to an issue in the case" does not violate due process). Because Petitioner's contentions cannot support a federal due process claim, he is not entitled to federal habeas relief.

**D.      Petitioner's Ground Four:  Petitioner's claim regarding the trial court's limiting cross-examination**

In Ground Four, Petitioner claims that the trial court's imposed limits on cross-examination violated his rights afforded by the "Fifth, Sixth, and Fourteenth Amendment" of the federal constitution.  Petitioner appears to be raising the same claim that he raised on direct appeal regarding his cross-examination of two of the prosecution's witnesses; namely, Dr. Brown, the forensic pathologist who performed the victim's autopsy and Petitioner's fellow inmate, Brad Borison.  See Resp't Lodged Doc A at 60-61.

Petitioner contentions regarding Dr. Brown, involve an autopsy performed by the pathologist in a previous unrelated case.  See Resp't Lodged Doc A at 60-61.  At hearing, outside the presence of the jury, Dr. Brown admitted, that in the former case, she had written a letter to a district attorney that confirmed that she had omitted from the autopsy, that the "child's weight was in the bottom three percent to avoid defense at a subsequent date having the family fill up their closet with food." See RT at 790.  Dr. Brown explained that she had been told by another prosecutor to not include this type of information because it could be obtained by the defense through discovery.  See RT at 803. The trial court ruled that Dr. Brown's letter reflecting her previous omission was admissible but that questions regarding the instructions provided to Dr. Brown in the other unrelated case would not be permitted.  See RT at 816-17.

Petitioner also asserted the trial court improperly frustrated his counsel's cross-examination of Brad Borison.  See Resp't Lodged Doc. A at 61.  Borison's testimony revealed that prior to trial, Petitioner allegedly admitted to Borison that, rather than falling on his step-daughter, he had shaken and thrown her.  See RT at 875-78.  Attempting to impeach this testimony on cross-examination, Petitioner's counsel asked Borison whether the "true motivation" for his testimony was the possibility of having his sentenced reduced.  See RT at 899-900.  In response, Borison denied that he had received any promises in exchange for his testimony.  See RT at 899-902.  Borison also testified that he did have one habeas corpus petition that he had not yet filed, but that petition's sole relief sought was his earned "good time conduct" credits and not a reduced sentence in exchange for his testimony.  See RT at 908-909.  Petitioner's counsel then questioned Borison regarding a second

1   pending habeas petition but Borison denied having any knowledge of any other petitions.  See RT at

2   908-909.  When Petitioner's counsel repeated his question regarding the possibility of a second

3   petition, the prosecution objected.  See RT at 908.  To address the objection, the trial court recessed

4   for sidebar conference.  See RT at 909-916.  Outside the presence of the jury, the trial court

5   admonished Petitioner's counsel and suggested that if he desired to impeach Borison regarding the

6   existence of other habeas petitions he could produce the document but otherwise counsel should

7   refrain from arguing with the witness by repeating his questions.[7]  See RT at 909-910, 915-916.

8          On direct appeal, the California Court of Appeal rejected Petitioner's claim regarding both

9   Dr. Brown and Borison:

> The first witness on whom [Petitioner] focuses was the forensic pathologist who
> performed Samantha's autopsy.  At a hearing outside the presence of the jury, she
> acknowledged not only writing a letter confirming her omission from an autopsy
> report in another case that the child's weight was in the bottom three percent "to avoid
> defense at a subsequent date having the family fill up their closet with food" but also
> receiving instruction from another prosecutor not to load up her autopsy reports with
> information the defense could acquire through discovery.  After argument, the court
> ruled her letter admissible but the other prosecutor's instruction inadmissible.
> (Evid.Code, § 352.)  In the presence of the jury, [Petitioner's] counsel impeached her
> with the letter.  "Generally speaking, the Confrontation Clause guarantees an
> opportunity for effective cross-examination, not cross-examination that is effective in
> whatever way, and to whatever extent, the defense might wish."  (*Delaware v.
> Fensterer* (1985) 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15.)  Courts "retain wide
> latitude insofar as the Confrontation Clause is concerned to impose reasonable limits"
> on cross-examination to avoid, inter alia, "confusion of the issues" and "interrogation
> that is repetitive or only marginally relevant."  (*Delaware v. Van Arsdall* (1986) 475
> U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674.)  Since the other prosecutor's
> instruction was cumulative to the letter, the court committed no error.
>
> The second witness on whom [Petitioner] focuses was an inmate from the jail cell
> next to his.  After the court sanitized the inmate's seven felony priors, the prosecutor
> so impeached him.  The inmate testified that [Petitioner] told him he fell on top of his
> stepdaughter after she came up behind him without his knowing she was there and
> wanted to know how to defend himself against a murder charge without eyewitnesses.
> Later, [Petitioner] told him he put her hand on his penis, she started to cry, and to get
> her to stop he eventually shook her and threw her.  The inmate denied going into
> [Petitioner's] cell without his knowledge to review his police reports.  After
> [Petitioner's] counsel questioned him about possible sentence modifications for his
> past and present testimony as a snitch, he testified he had a habeas corpus petition
> pending but solely for conduct credits to which he was entitled.  At that juncture, the
> court called for a sidebar at which [Petitioner's] counsel agreed to bring a certified
> copy of the habeas corpus petition to impeach the inmate.  Showing no compliance

---

27          [7]Additionally, on direct appeal, Petitioner argued that because the trial court sanitized Borison's seven felony prior,

28   including a conviction for perjury, the trial court improperly limited Petitioner's ability to cross-examine Borison regarding
     the perjury conviction.  See Resp't Lodged Doc A at 61.

with that agreement, the record belies his frivolous argument that "the court interfer[ed] with defense counsel's cross-examination." [FN8]

> FN8.  In his petition for rehearing, [Petitioner] argues that our opinion "omits the significant fact that the 'sanitized' priors included perjury." He argues out of context.  First, by neither citing to the record nor requesting augmentation of the record, he brings to our attention not a single arguably relevant fact about the inmate's perjury prior. (See Cal. Rules of Court, rules 12(a), 14(a)(1)(C), 32.1(d).)  Second, he neglects to mention that the court ordered sanitization of all of the inmate's priors only after the prosecutor asked the court to apply to the inmate the ruling requiring the sanitizing of [Petitioner's] priors and only after his counsel, while opposing that request, nonetheless acknowledged the prosecutor's "reasonable expression of interests in reciprocity." Consequently, since the admission for impeachment of even a perjury prior is subject to the exercise of the court's discretion, the significance of the fact "that the 'sanitized' priors included perjury" is not at all apparent.  (See *People v. Castro* (1985) 38 Cal.3d 301, 316-317, 211 Cal.Rptr. 719, 696 P.2d 111.)

See <u>Renteria</u> at 8-9 (some footnotes omitted).

Criminal defendants are constitutionally entitled to confront and cross-examine adverse witnesses, subject to the court's discretion to place appropriate limits on such inquiries.  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678–79 (1986). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  <u>Id.</u> at 679; <u>Davis v. Alaska</u>, 415 U.S. 308, 316 (1974).  The Confrontation Clause "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985) (per curiam).

Preclusion of Petitioner's proposed questions to Dr. Brown regarding the instructions she received in an unrelated case did not violate Petitioner's confrontation rights.  The questions at best, were only marginally relevant to the witness's credibility.  The undersigned agrees with the Court of Appeal's finding that, any additional questioning regarding the previous instructions would have been cumulative.

Petitioner's contentions regarding the cross-examination of Borison similarly lack merit. The record reflects that rather than limit cross-examination, the trial court advised Petitioner's counsel to stop arguing with the witness and that if he wished to explore the witness's pending

1    habeas writ, he could obtain the document and continue the questioning.  See RT at 909-910, 915-

2    916.[9]  In both Dr. Brown's and Borison's cross-examination, the jury would not have had a

3    significantly different view of the witnesses' credibility had the questions been allowed.  See Van

4    Arsdall, 475 U.S. at 680.  In the context of this habeas petition brought under Section 2254, the

5    Court must only consider whether the state court's decision involved an unreasonable application of

6    federal law or resulted in a decision that was based on an unreasonable determination of the facts in

7    light of the evidence presented.  28 U.S.C. 2254(d).  Here, the state court's application of law was a

8    reasonable application of law and was based on a reasonable determination of the facts presented

9    there.  Accordingly, federal habeas relief for this claim is not available

10           **E.       Petitioner's Ground Five:  Constitutionality of Section 273ab**

11           Petitioner's Ground Five asserts that California Penal Code § 273ab violates due process by

12   imposing punishment equivalent to that imposed on a first degree murder conviction without

13   requiring proof of malice, premeditation and deliberation.  See Petition at 7.  On direct appeal,

14   Petitioner argued that "the due process clause does not permit the state to redefine its murder statute,

15   provide the same penalties as have always been imposed for a murder conviction, but delete from the

16   state's burden of proof elements which are rooted in the history of the offense."  See Resp't Lodged

17   Doc. A at 20-21.  In support of this position, Petitioner cited to In re Kinship, 397 U.S. 358 (1970),

18   Multan v. Wilbur, 421 U.S. 684 (1975) and Patterson v. New York, 432 U.S. 197 (1977), and argued

19   § 273ab violated his right to due process because it allowed imposition of the punishment for first

20   degree murder without proof of the mens era required to support a murder conviction.  See Resp't

21   Lodged Doc. A at 20-21.

22

23   _____

24        [9]Though not specifically raised in the instant petition, Petitioner's argument on direct appeal that the trial court
     improperly limited his ability to cross-examine Borison regarding an alleged prior perjury conviction also lacks merit for at

25   least two reasons.  First, just as the Court of Appeal had found, there is nothing in the record in support of this allegation.
     Second, a state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either

26   by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally
     fair trial guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918,

27   919-20 (9th Cir. 1991).  Here, in light of the substantial evidence adduced at trial, including Petitioner's own inculpatory
     statements that the victim "did not deserve a lie" (see RT at 589) and the multiple experts which readily rebutted Petitioner's

28   defense theory (see RT at 631, 726, 841), Petitioner has failed to demonstrate the trial court's ruling was either unfair or
     violated of due process.

In the last reasoned opinion, the Court of Appeal rejected this claim stating in part:

> First, section 273ab is an assault statute, not a murder statute. (*People v. Norman* (2003) 109 Cal.App.4th 221, 227-229, 134 Cal.Rptr.2d 652.)  Dictum to the contrary is not persuasive.  (See, e.g., *People v. Malfavon* (2002) 102 Cal.App.4th 727, 739-740, 125 Cal.Rptr.2d 618 [rejecting dictum in *People v. Preller* (1997) 54 Cal.App.4th 93, 97-98], and *People v. Albritton* (1998) 67 Cal.App.4th 647, 655, 79 Cal.Rptr.2d 169 [criticizing dictum in *Preller, supra,* at pp. 97-98, 62 Cal.Rptr.2d 507].)  Second, the Legislature "has the sole discretion to determine the appropriate penalty for state crimes, within the confines of the Eighth Amendment's protection against cruel and unusual punishment." (*Malfavon, supra,* at p. 737, 125 Cal.Rptr.2d 618.)
>
> Third, "the Due Process Clause of the Fourteenth Amendment does not, nor does anything in the Constitution, require a State to fix or impose any particular penalty for any crime it may define or to impose the same or 'proportionate' sentences for separate and independent crimes." (*Williams v. State of Oklahoma* (1959) 358 U.S. 576, 586, 79 S.Ct. 421, 3 L.Ed.2d 516.)  Fourth, since the legislative history of a statute is not determinative of a due process challenge, once "'there are plausible reasons for [the legislature's] action, our inquiry is at an end.'" (*Montana v. Egelhoff* (1996) 518 U.S. 37, 49, fn. 3, 116 S.Ct. 2013, 135 L.Ed.2d 361.)

See Renteria at 4.

The state legislatures have broad authority to define crimes and impose punishments thereon.

See, e.g., Brecht v. Abrahamson, 507 U.S. 619, 635 (1993) (quoting Engle v. Isaac, 456 U.S. 107, 128, (1982)).  The Due Process Clause prevents only imposition of punishments based on "arbitrary" distinctions.  See Chapman v. U.S., 500 U.S. 453, 464-65 (1991).

> When a State's power to define criminal conduct is challenged under the Due Process Clause, we inquire only whether the law "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Patterson, 432 U.S., at 202, 97 S.Ct., at 2322 (internal quotation marks omitted).

Montana v. Egelhoff, 518 U.S. 37, 58 (1996) (Ginsburg, J., concurring).

In imposing the same punishment imposed on those convicted of first degree murder, Section 273ab does not present the type of arbitrary distinction that would run afoul of the Due Process clause, nor does it offend fundamental principles of justice.  The undersigned finds the California Court of Appeal's reliance on the Williams opinion, applying United States Supreme Court standards to the issue of whether § 273ab satisfies due process, was objectively reasonable and not contrary to, nor an unreasonable application of controlling federal authority.  See 28 U.S.C. § 2254(d)(1). Accordingly, habeas relief should be denied on this claim.

**E.    Petitioner's Ground Six:  Petitioner's claim that § 273ab is included in the offense of murder.**

In Ground Six, Petitioner contends he was erroneously convicted of two separate homicide charges, both Count One (§ 187, subd. (a)) and Count Two (§ 273ab) in violation of his rights afforded under the Fifth, Sixth, and Fourteenth Amendments of the federal constitution.  See Petition at 6.  On direct appeal, Petitioner argued that his conviction was improper because child abuse homicide under section 273ab is a "necessarily included" offense of murder.  See Resp't Lodged Doc. A at 26.

The state Court of Appeal rejected Petitioner's claim as follows:

On the premise that both the statutory elements test and the accusatory pleadings test show that section 273ab is a lesser included offense of section 187, [Petitioner] argues that the rule precluding multiple convictions of lesser included offenses requires striking one of his convictions.  The Attorney General argues that both convictions are proper.  We agree with the Attorney General.

An offense is a lesser included offense "if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117, 77 Cal.Rptr.2d 848, 960 P.2d 1073.)  As to the statutory elements test, the "elements of second degree murder are: (1) an unlawful killing; (2) accomplished with malice aforethought, whether express or implied.  [Citations.]  The elements of [section 273ab] are: (1) A person, having the care or custody of a child under the age of eight; (2) assaults this child; (3) by means of force that to a reasonable person was likely to produce great bodily injury; (4) resulting in the child's death.  [Citations.]" (*People v. Malfavon*, *supra*, 102 Cal.App.4th at pp. 735-736, 125 Cal.Rptr.2d 618.)  Section 273ab "requires proof of the following elements, none of which are required for murder:  (1) the age of the victim must be under eight, (2) the assailant must occupy the position of caretaker of the child, and (3) the assailant must commit an assault with force such that a reasonable person would know it was likely to inflict great bodily injury." (*Id.* at p. 743, 125 Cal.Rptr.2d 618; see *People v. Basuta*, *supra*, 94 Cal.App.4th at p. 399, 114 Cal.Rptr.2d 285.)  [Petitioner's] premise about the statutory elements test is invalid.

With reference to the accusatory pleadings test, the information alleged in count one that [Petitioner] "did willfully and unlawfully with malice aforethought murder Samantha [ ], age 2 ( [date of birth] ), a human being in violation of Penal Code section 187(a), a felony, charged as murder in the second degree" and in count two that he "did willfully and unlawfully, while having care and custody of a child under the age of eight years, assault the child, to wit, Samantha [ ], age 2 ( [date of birth] ), by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the death of the child, in violation of Penal Code section 273ab, a felony."  Count two alleged the following facts, none of which was alleged in count one: (1) he had care and custody of a child (2) under the age of eight years (3) whom he assaulted by means of force that to a reasonable person would be likely to produce great bodily injury.  His premise about the accusatory pleadings test is equally invalid. [Petitioner's] premise about the accusatory pleadings test is likewise invalid.

1    Lacking a valid premise, his argument fails.

2    See Renteria at 5-6.

3    Petitioner's claims regarding his conviction on Counts One and Two were denied by the

4    California Court of Appeal on state law grounds in a thorough and reasoned opinion.  The state

5    court's decision that Petitioner's conviction on both counts did not violate state law or the state

6    constitution, derived from its analysis of state law, is binding on this court.  See Lewis v. Jeffers,

7    497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law...."); see

8    also Rivera v. Illinois, 556 U.S. 148 (2009) ("[A] mere error of state law . . . is not a denial of due

9    process") (quoting Engle v. Isaac, 456 U.S. 107, 121, n. 21 (1982) and Estelle v. McGuire, 502 U.S.

10   62, 67, 72-73 (1991)); Waddington v. Sarausad, 555 U.S. 179 n. 5 (2009) ("we have repeatedly held

11   that 'it is not the province of a federal habeas court to reexamine state-court determinations on

12   state-law questions"); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("a state court's interpretation of

13   state law . . . binds a federal court sitting in federal habeas").

14   Petitioner has also failed to demonstrate that his conviction on these counts violated federal

15   law or that the state court's decision was contrary to or an unreasonable application of United States

16   Supreme Court authority.  There is no evidence that Petitioner's sentence or his conviction on

17   Counts One and Two were violative of his right to due process or any other federal constitutional

18   right.

19       **F.    Petitioner's Ground Seven:  Petitioner's claim of judicial bias**

20   Petitioner's Ground Seven claims that the trial court judge demonstrated judicial bias which

21   contributed to Petitioner's conviction and violated due process, Petitioner's right to a fair trial and

22   effective assistance of counsel.  See Petition at 6.  On direct appeal, Petitioner alleged several

23   instances of judicial bias, each of which were addressed by the Court of Appeal:

24       At the outset, [Petitioner] observes that the court "appeared bothered by defense
         counsel's zealous advocacy throughout the trial" and characterizes as judicial
25       misconduct comments and rulings as to only some of which his brief includes
         citations to the record.  "Each brief must: [¶] ... [¶] support any reference to a matter
26       in the record by a citation to the record."  (Cal. Rules of Court, rule 14(a)(1)(C),
         italics added.)  For the sake of judicial efficiency, we choose to disregard the
27       noncompliance and, in the chronology of trial, to address the merits of his argument
         as if his briefing were proper.  (See Cal. Rules of Court, rule 14(e)(2)(C).)

28

Outside the presence of the jury, the court ordered the prosecutor and [Petitioner's] counsel to refrain from touching the shoulders of, respectively, the investigating officer and [Petitioner] so as to preclude a physical display to the jury of those relationships. [Petitioner's] counsel had objected to the order, which a motion by the prosecutor had precipitated, on the ground that his touching his client on the shoulder was neither improper nor objectionable.

Again outside the presence of the jury, the court ordered [Petitioner's] counsel not to mention to the jury his former employment as a prosecutor. The prosecutor had told the court that some defense attorneys who had been prosecutors had told juries, "[W]ell, when I was a D.A., you know, I wouldn't have done it this way." [Petitioner's] counsel had commented that his doing so had never occurred to him.

Still outside the presence of the jury, the court and [Petitioner's] counsel discussed his impeaching the forensic pathologist with two firings in her employment history. The court disavowed having "any problem with some inquiry" about her employment history but cautioned he might harm his client if the jury were to "pick[ ] up on the fact that you're in a 'game-playing mode.'" "[R]espectfully tak[ing] great exception" to the court's comment, [Petitioner's] counsel previewed his impeachment questions to the court to make sure he did not go "over the line." The court assured him he knew "where this line is that we're talking about" and promised not to "stand in the way of your asking the question[s] that you've just indicated."

Yet again outside the presence of the jury, the court and [Petitioner's] counsel discussed his impeaching the forensic pathologist with the letter she wrote confirming her deletion of information from the autopsy report in the case. The court asked him, "Who gave it to you?," but he refused to answer on the ground of work product privilege. The court replied, "You can't play this hide the ball process," and barred him from using the letter. [Petitioner's] counsel at once identified by name the attorney who gave him the letter, and the court immediately convened a hearing at which the forensic pathologist testified, both counsel argued, and the court reversed the prior ruling and permitted him to use the letter.

In the presence of the jury, [Petitioner's] counsel objected to a comment in the prosecutor's opening statement as "argumentative." The court replied, "Overruled. This is opening statement. It's not evidence. We need no further objections during openings. Go ahead."

Likewise in the presence of the jury, the prosecutor objected to questions on cross-examination that inquired about a medical expert's familiarity with several articles but that also included details about those articles. At one point, the court stated that the questioner can make a "reasonable reference" to the contents of the article but "can't get too far into it." Shortly afterward, [Petitioner's] counsel asked if the witness was "familiar with a study of human skull fractures in mortuary experiments where infant cadavers age two to eight months were dropped from 82 centimeters onto concrete foam, black linoleum, or thin carpet and all sustained skull fractures." The court characterized the question as "going way over the line" and sustained the prosecutor's objection. [Petitioner's] counsel immediately broke the question into smaller discrete parts, each of which the witness answered, with no objection by the prosecutor and no comment by the court. Shortly afterward, [Petitioner's] counsel asked the witness to read the highlighted portion of an article. The prosecutor objected "to her reading an article in court." The court characterized his question as "over the line," and [Petitioner's] counsel-before a formal ruling by the court-asked the witness to read the article to herself. Once she did, he asked her several questions, each of which she answered, again with no objection by the

prosecutor and no comment by the court.

Outside the presence of the jury at the sidebar on the issue of impeaching the inmate with the habeas corpus petition, [Petitioner's] counsel agreed to bring a certified copy of the petition to solve his difficulty cross-examining a witness about a document that was not in court especially since the author of the document-the inmate's attorney, not the inmate-likewise was not in court. In the colloquy before the agreement, the court told [Petitioner's] counsel that arguing with the witness instead of engaging him in a question-and-answer dialogue was neither professional nor responsible, consumed inordinate time, and had to stop.

. . .

Of [Petitioner's] seven complaints, only two-the court's comments on overruling his counsel's objection during the prosecutor's opening statement and on sustaining the prosecutor's objections to questions on cross-examination of a medical expert-occurred in the presence of the jury. Those comments showed no "deep-seated favoritism or antagonism" and posed no threat to the impartiality of the jury's deliberations. (Cf. *Liteky v. United States* (1994) 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474.) Involving matters outside the presence of the jury, his other complaints ipso facto could not possibly have posed any such threat.

. . .

A court has the discretion to control the mode of questioning of a witness as necessary for the proper determination of the case. (*People v. Calderon* (1994) 9 Cal.4th 69, 75, 36 Cal.Rptr.2d 333, 885 P.2d 83.) A court commits judicial misconduct by persistently making discourteous and disparaging remarks discrediting the defense or creating the impression of an alliance between the court and the prosecution. (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 353, 63 Cal.Rptr.2d 1, 935 P.2d 708.) Here, the record suggests only that the court occasionally showed irritation-almost always outside the presence of the jury-with [Petitioner's] counsel's courtroom style. Our task on appeal is to "'evaluate the propriety of judicial comment on a case-by-case basis, noting whether the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial by jury.'" (*People v. Sanders* (1995) 11 Cal.4th 475, 531-532, 46 Cal.Rptr.2d 751, 905 P.2d 420.) The record here shows no judicial misconduct. Ipso facto there was no violation of [Petitioner's] constitutional rights to due process, a fair trial, or the effective assistance of counsel.

See Renteria at 10-12.

The Due Process Clause guarantees a criminal defendant the right to an impartial judge. In re Murchison, 349 U.S. 133, 136 (1955). A defendant is "entitled to a judge who has no direct personal interest in the outcome of a proceeding." Paradis v. Arave, 20 F.3d 950, 958 (9th Cir. 1994), cert. denied, 513 U.S. 1117 (1995). To succeed on a judicial bias claim, Petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." Withrow v. Larkin, 421 U.S. 35, 47 (1975); see also Ortiz v. Stewart, 149 F.3d 923, 938 (9th Cir. 1998), cert. denied, 526 U.S. 1123 (1999). On habeas corpus review of a state conviction, judicial misconduct

1   will warrant habeas relief only where "the state trial judge's behavior rendered the trial so

2   fundamentally unfair as to violate federal due process under the United States Constitution."

3   Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995), cert. denied, 517 U.S. 1158 (1996).  A state

4   court finding of the absence of judicial bias is entitled to the presumption of correctness under 28

5   U.S.C. 2254(e)(1).  Ortiz v. Stewart, 149 F.3d 923, 938 (9th Cir. 1998).

6           As noted by the Court of Appeal, Petitioner fails to allege any facts demonstrating judicial

7   bias.  The majority of Petitioner's claimed instances of judicial bias involve the trial court's rulings.

8   These include the court's rulings on both counsels' physical display of relationships in the presence

9   of the jury, defense counsel's references to his former employment as a prosecutor, the forensic

10  pathologist "omission" letter, (see discussion above at Ground Four), defense counsel's objection

11  during the prosecution's opening statement, as well as its various rulings during defense counsel's

12  cross-examination.  Though Petitioner may have disagreed with the court's rulings, under federal

13  law, a judicial ruling "almost never" can demonstrate judicial bias.  Liteky v. United States, 510 U.S.

14  540, 555 (1994); Ortiz v. Stewart, supra, 149 F.3d at 940; see also United States v. Bauer, 84 F.3d

15  1549, 1560 (9th Cir. 1996), cert. denied, 519 U.S. 907 (1997); McCalden v. Calif. Library Ass'n, 955

16  F.2d 1214, 1225 (9th Cir. 1990), cert. denied, 504 U.S. 957 (1992) ("Adverse rulings alone are not

17  sufficient to require recusal, even if the number of such rulings is extraordinarily high").

18          Petitioner's assertions regarding the trial court's disapproving commentary (that defense

19  counsel was "game playing" or "unprofessional") similarly fail to support a charge of judicial bias.

20  Regarding a judge's remarks made during trial, the United States Supreme Court has stated:

21          [J]udicial remarks during the course of a trial that are critical or disapproving of, or
            even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or
22          partiality challenge.  They *may* do so if they reveal an opinion that derives from an
            extrajudicial source; and they *will* do so if they reveal such a high degree of
23          favoritism or antagonism as to make fair judgment impossible.

24  Liteky v. United States, 510 U.S. 540, 555 (1994) [emphasis in the original].

25          Petitioner has not shown that the judge's rulings or comments exhibited bias or misconduct

26  so grave as to violate due process.  See Duckett v. Godinez, 67 F.3d at 740-41 (judge's questioning

27  of prosecution witness during direct examination and expressions of "clear frustration and hostility"

28  toward defense witness, when considered in the context of the proceedings as a whole, did not

violate due process); <u>see</u> also <u>United States v. Martin</u>, 278 F.3d 988, 996-97, 1005 (9th Cir. 2002)

(judge's comments at sentencing hearing that defendant's testimony was incredible and "a crock of

baloney" did not warrant recusal); <u>United States v. Wilkerson</u>, 208 F.3d 794, 798-99 (9th Cir. 2000),

cert. denied, 531 U.S. 1182 (2001) (judge's suggestion that prosecution add a firearms charge, and

judge's remark that the judge represented the "community" and that the "community" was "tired" of

armed robbery and guns, did not warrant recusal).  The undersigned has reviewed the record and has

discerned no judicial conduct rendering Petitioner's trial "so fundamentally unfair as to violate

federal due process . . . ."  <u>See</u> <u>Duckett v. Godinez</u>, 67 F.3d at 740.  The state court's decision was

not contrary to, or involved an unreasonable application of, clearly established Supreme Court

precedent.

      **G.**      **Petitioner's Ground Eight:  Admission of Petitioner's Prior Conviction.**

      Petitioner's eighth ground for relief contends that the trial court violated his rights to due

process and a fair trial when it admitted evidence of Petitioner's prior crime involving child abuse.

<u>See</u> Petition at 7.  On direct appeal, Petitioner argued that the evidence "was improperly admitted as

propensity evidence, which is not permitted . . ." because in admitting the evidence the jury was

advised that Petitioner was "a convicted child abuser."  <u>See</u> Resp't Lodged Doc A at 73-74.  In the

last reasoned state court decision, the Court of Appeal for the Fifth Appellate District addressed the

claim as follows:

> [Petitioner] argues that the admission of evidence of his 10-year-old felony child
> abuse prior for burning his former girlfriend's 22-month-old daughter with hot water
> violated state evidentiary statutes and federal and state due process and fair trial
> guarantees.  The Attorney General argues that the court committed no error.
>
> On his motion to admit the evidence, the prosecutor noted that [Petitioner's] defense
> was accident and argued that the evidence was not admissible as "improper character
> evidence" but rather was admissible "to show motive, intent, and absence of mistake
> or accident."  (Evid.Code, §§ 1101, subds. (a), (b).)  [Petitioner] argued that in the
> absence of evidence of shaken baby syndrome in the prior the evidence the prosecutor
> sought to admit amounted to improper character evidence.  (Evid.Code, §§ 352, 1101,
> subd. (a); former Pen. Code, § 273a, subd. (1).)  The court balanced prejudice against
> probative value, rejected [Petitioner's] argument, and ruled the evidence admissible.
>
> By noting that "there is nothing intrinsically distinct about the act of violently
> shaking a vulnerable infant that separates it from other methods of direct child
> abuse," the California Supreme Court, too, has rejected [Petitioner's] argument about
> the absence of shaken baby syndrome in the prior.  (*People v. Sargent* (1999) 19
> Cal.4th 1206, 1223, 81 Cal.Rptr.2d 835, 970 P.2d 409.)  Here, the prosecutor

presented to the jury evidence that was probative of intent and absence of accident but that was not disproportionately prejudicial.  After identifying the child's injuries in the two photographs the court admitted of the five the prosecutor proffered, the primary investigator testified to [Petitioner's] statements that she "stunk of urine" so he "dipped her butt" into a bucket of "steaming hot" water for five or six seconds, that she looked shocked but did not cry, and that when he felt how hot the water was as he lifted her out he applied baby oil and put a fresh diaper on her.  Two medical experts testified briefly to the severity of her injuries as either second-degree or third-degree, but not first-degree, burns.

The court instructed the jury before the presentation of evidence and again before deliberations to consider [Petitioner's] prior not to show that he had a bad character or a disposition to commit crime but only for the limited purpose of determining whether his prior tended to show "the existence of the intent which is a necessary element of the crime charged." (CALJIC No. 2.50.)  Congruently, the prosecutor pointedly asked the jury to infer from the prior that Samantha's injuries were "not an accident."

On appeal, where the abuse of discretion standard applies to a ruling admitting or excluding evidence, the reviewing court will disturb the ruling only on a showing of an arbitrary, capricious, or patently absurd exercise of discretion that caused a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10, 82 Cal.Rptr.2d 413, 971 P.2d 618.)  No abuse of discretion appears here.

See Renteria at 12-13.

As the Ninth Circuit has stated:

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, [see Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2005),] it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.  Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." [Carey v. Musladin, 549 U.S. at 77.]  Under the strict standards of AEDPA, we are therefore without power to issue the writ on the basis of Holley's [admission] claims.

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

The Supreme Court has declined to hold that evidence of other crimes or bad acts "so infused the trial with unfairness as to deny due process of law."  Estelle v. McGuire, 502 U.S. 62, 75, n. 5, (1991) (noting that the Court "express[ed] no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").  The Court has also left open the question of whether the admission of propensity evidence violates due process.  Id.  Because the Supreme Court has declined to address the issue, the Ninth Circuit has held that a state court's rejection of a due process violation based on the admission

of prior crimes or bad acts is not an unreasonable application of clearly established federal law.  See, e.g., Alberni v. McDaniel, 458 F.3d 860, 866–67 (9th Cir. 2006); accord Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (reaffirming Alberni).  Consequently, Petitioner's claim is barred by the lack of clearly established federal law on this issue.

Even if Holley did not supply the rule for this claim, the undersigned would find that admission of the prior conviction did not have a "substantial and injurious effect" upon the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 622 (1993).  As noted by the Court of Appeal, the trial court properly instructed the jury that it could not consider Petitioner's prior conviction for child abuse for purposes of demonstrating Petitioner's propensity for the current crime  See RT at 1223-24, CT at 585-86.  This limiting instruction mitigated any danger that the jury would use evidence of petitioner's prior convictions as evidence of propensity to commit crimes.  It is presumed that the jury followed the court's instructions in this regard.  Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.") (citing Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  The admission of Petitioner's prior conviction for child abuse did not violate due process and Petitioner's claim should be denied.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that:

1.      The petition for writ of habeas corpus be DENIED WITH PREJUDICE; and

2.      The Clerk of the Court be DIRECTED to enter Judgment for Respondent; and

3.      A Certificate of Appealability be DENIED.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii , United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) court days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are

advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

　　　　IT IS SO ORDERED.

　　　　**Dated:**   **August 24, 2011**　　　　　　　　**/s/ Dennis L. Beck**
　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE